IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **MYMAIL, LTD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:04 - CV - 189** |
| | § | |
| **AMERICA ONLINE, INC., et al.** | § | |
| | § | |
| **Defendants** | § | |
| | § | |

## MEMORANDUM OPINION

This Claim Construction Opinion interprets the disputed terms in United States Patent No.

6,571,290 ("the patent" or "the '290 patent"). The disputed terms, as they appear in the claims of

the '290 patent, can be found in Appendix A. A chart summarizing the Court's construction of the

disputed terms, as well as the parties' agreed constructions, can be found in Appendix B.


## BACKGROUND

Plaintiff MyMail, Ltd. ("Plaintiff" or "MyMail") accuses Defendants America Online, Inc.

("AOL"), Earthlink, Inc. ("Earthlink"), GTE.net, LLC ("GTE"), Juno Online Services, Inc. ("Juno"),

Netbrands, Inc. ("Netbrands"), Netzero, Inc. ("Netzero"), Prodigy Communications Corp.

("Prodigy"), and Southwestern Bell Internet Services, Inc. ("Southwestern Bell")(collectively

"Defendants") of infringing claims 1-8 and 11-13 of the '290 patent. The '290 patent discloses a

method for providing internet access services. The '290 patent claims a priority date to a provisional

application filed on June 19, 1997, making June 19, 1996 the critical date for purposes of prior art.

1

## APPLICABLE LAW

In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 338 F.3d 858, 861 (Fed. Cir. 2004) (citing cases); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the specification and the prosecution history. *C.R. Bard, Inc.*, 388 F.3d at 861. First, courts give "claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003). Second, the court must determine whether it must deviate from the claim language's ordinary and accustomed meaning. *Bell Atl. Network Servs., Inc.*, 262 F.3d at 1268. There is a "heavy presumption" that claim terms carry their ordinary and customary meaning, which is only rebutted if the patent "expresses an intention to impart novel meaning to [them]." *Sunrace Roots Enter. Co., LTD v. SRAM Corp.*, 336 F.3d 1298, 1302 (Fed. Cir. 2003); *Id.* "This presumption is overcome: (1) where the patentee has chosen to be his own lexicographer, or (2) where a claim term deprives the claim of clarity such that there is no means by which the scope of the claim may be ascertained from the language used." *Bell Atl. Network Servs., Inc.*, 262 F.3d at 1268. This presumption is also overcome if the inventor disavowed or disclaimed the scope of coverage. *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002). When a court attempts to define a term, it "immerses itself in the specification, the prior art, and other evidence, such as the understanding of skilled artisans at the time of the invention, to discern the context and normal usage of the words in the patent claim." *Alloc, Inc.*, 342 F.3d at 1368.

"[A]mong the intrinsic evidence, the specification is always highly relevant to the claim

construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms.  Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Id*.  However, the specification may not redefine particular claim terms away from their ordinary meanings unless the intrinsic evidence "clearly set[s] forth or clearly redefine[s] a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." *Bell Atl. Network Servs., Inc.*, 262 F.3d at 1268 (internal quotations omitted).  Thus, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

A patentee  may define terms he coins "[s]o long as the meaning of an expression is made reasonably clear and its use is consistent within a patent disclosure." *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984).  When a patentee acts as his own lexicographer to coin terms that have no ordinary and customary meanings in the art but does not define the terms, the court first gives the term components their plain and customary meanings to infer the meaning of the phrase.  *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004)

3

("the components of the term have well-recognized meanings, which allow the reader to infer the meaning of the entire phrase with reasonable confidence").  "Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence–the written description and the prosecution history–to obtain the meaning of that term." *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004).

## CONSTRUCTION OF DISPUTED TERMS IN THE '290 PATENT

The Court will first construct ASP and NSP, given those terms' prominence in the patent. The Court will then construe, in alphabetical order, the remaining disputed terms.

*ASP and NSP*

Two new terms, Access Service Provider ("ASP") and Network Service Provider ("NSP"), are coined by the patentee to claim the invention in the '290 patent.  In the lexicon of the '290 patent, an ASP performs many of the same log-in and authentication functions performed by the disclosed prior-art Internet Service Providers ("ISPs"), and an NSP acts similar to prior-art Network Access Providers ("NAPs"), providing the physical connection between the customer and internet. However, the coined terms are not completely analogous to their well-known prior art counterparts.  Indeed, these coined terms help delineate the '290 patent's claimed invention from prior art internet access systems, such as those using Remote Authentication Dial-In User Service ("RADIUS") servers for authentication management.

The term "ASP" (or variation thereof) appears in every asserted claim of the patent-in-suit. "NSP" appears in all asserted claims except independent Claim 3 and dependent Claims 4 and 5.

MyMail asserts that ASP should be defined as "a party that offers network access service to the user via one or more NSPs" and NSP should be defined as "a party other than the ASP that provides the actual connection to the network."  Defendants' propose defining ASP as "an ISP broker including a server that (1) has a public Internet address, (2) maintains ISP-specific user IDs and passwords for multiple ISPs, and (3) transmits to the user's computer a user ID and password for a particular ISP selected by the broker based on the user's location and the user's preference for a type of Internet service (such as lowest cost service, highest reliability service, and most available service)" and NSP as "a provider of network services (such as an ISP) that (1) authenticates its customers for access to its services (such as Internet access, email, etc.) based on user IDs and passwords that are specific to the provider, and (2) grants its customers Internet access directly from a modem bank."

To properly define these coined terms, the Court first looks to the ordinary meaning of each component word in ASP and NSP.  *See Bancorp Servs.,* 359 F.3d at 1372.  That however provides little insight into the meaning of either coined term, so the Court next looks to the specification.  *See Goldenberg,* 373 F.3d at 1164.  Although the definitions proposed by both MyMail and Defendants find some support in the specification, when construing terms like NSP and ASP that lack an accepted meaning in the art, the Court must construe the terms as broadly as provided for by the patent itself.  *Irdeto Access, Inc. v. EchoStar Satellite Corp.,* 383 F.3d 1295, 1300 (Fed. Cir. 2004). The Court thus rejects both sets of definitions since both import unnecessary limitations and neither reflect the breadth provided in the specification, figures, and claims.

Figure 1 of the '290 patent provides that a user dials into an NSP, is authenticated, and then connects to the internet.  The user next communicates, over the internet, with an ASP.  The ASP again authenticates the user and (re)assigns him to an appropriate NSP, which provides internet

5

access for the rest of the session..  The specification teaches that the ASP offers network access via multiple NSPs, *see* Col. 8:32-34, but Claim 8 establishes that an ASP works with either a single NSP or multiple NSPs.  Accordingly, the Court defines NSP as "a party that provides a connection to the network and authenticates users for access to the network" and ASP as "a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs."

### *"800" Telephone Number*

The term "800 telephone number" appears only in Claim 7.  MyMail asserts that an "800 telephone number" is defined as a "toll-free telephone number," while Defendants urge the Court to construe this term as "a toll free telephone number for long-distance calls, with a prefix of 800."  The Court adopts MyMail's proposed definition.  The specification refers to "an 800 *type* toll-free number," implying any number in the 8xx-family of toll-free calling prefixes (800, 866, 877, 888, etc). *See* Col. 14:35-36. The Court finds no support for so narrowly construing "800 telephone number" to require the prefix of "800" or importing the requirement that the call must be long-distance.

### *Access, accessing, all forms of "access"*

This term appears, in some form, in every claim of the patent.  MyMail argues that all forms of "access" should be defined "establish/establishing the ability to communicate with," while Defendants propose "the right to gain entry to a computer system and make use of its resources (for example, to retrieve data from another computer)."

MyMail's proposed construction is at odds with the language of Claims 11 and 13 of the patent, which recites both "access" and "communicate."   It makes no sense to define "access" as a function of "communicate."   The Court will instead substantially adopt Defendants' proposed construction, which is consistent with the ordinary meaning of "access."  The Webster's New World Dictionary of Computer Terms defines "access" as "the right or ability to gain entry to a computer system and make use of its resources."  WEBSTER'S NEW WORLD DICTIONARY OF COMPUTER TERMS 12 (6th ed. 1997).   Accordingly, the Court defines all forms of "access" as "to gain entry to a computer system and make use of its resources."

*Cause, causing, all forms of "cause"*

The term cause is a common word with no peculiar meaning in the '290 patent.  Accordingly, the Court concludes "cause" means "bring about."

*Communication with the network; communicating/communication with an ASP; all forms of "communicate"*

The term "communicate" appears, in some form, in Claims 1, 11, 12, and 13.   MyMail proposes the term be construed to mean "the ability to exchange data" or the "exchange of data," depending on the context within the claims of the '290 patent.  Implicit in MyMail's definition is the limitation that communication must be a two-way process.  Defendants, citing two dictionaries, assert that "communicate" means "transmit information" and also argue that communication can be either one-way or two-way.

The specification describes a communications connection where the user and NSP transmit

and receive data.  *See* Col. 7:10-16.  Communication cannot then be defined as transmitting information since it also entails receiving information.  The Court thus rejects Defendants' proposed definition as being inconsistent with the specification.  However, the Court must still determine whether communication, as defined in the '290 patent, includes one-way processes or must be limited to two-way processes.

The Court concludes that in the context of the '290 claim language, communication cannot be one-way since that would render the word "with" meaningless.  The word "with" implies a two-way conversation.  Had the patentee intended to include one-way conversation in his definition of "communicate," he would have replaced "with" with "to," or some other analogous word or phrase, in his claim language.  The Court therefore substantially adopts MyMail's definition since "exchange" better reflects the two-way nature of communication.

The parties additionally dispute the meaning of the phrases "communication with the network" and "communicating with an ASP."  MyMail proposes that "communicating with an ASP" be defined as "exchange of data with an ASP over a connection to the network."  Defendants propose that "communication with the network" be defined as "transmission of information to a system of interconnected computers."  The Court notes that MyMail's "over a connection to the network" limitation is already implicit in the definition of communication.  For example, the Microsoft Press Computer Dictionary states that computer communication requires a connection or link between the computers.  *See* MICROSOFT PRESS COMPUTER DICTIONARY 102 (3d ed. 1997).  Thus, one skilled in the art understands that communication occurs over a connection to the network.  However, a juror may not fully appreciate this nuance.  Given that the purpose of claim construction is to "elaborat[e] the normally terse claim language in order to understand and explain . . . the scope of the claims,"

8

the Court concludes that limitation is necessary to definitively express what is otherwise implied. *Embrex, Inc. v. Serv. Engr. Corp.,* 216 F.3d 1343, 1347 (Fed. Cir. 2000).  The Court therefore construes "communication" to mean "exchange of data," "communication with the network" to mean "exchange of data over a connection to the network," and "communication with an ASP" to mean "exchange of a data with an ASP over a connection to the network."

*Connecting to the network; providing to the user a connection to the network; all forms of connect*

The parties differ as to whether a connection to the network is establishing a computer on the network (MyMail's proposed definition) or establishing a link to the network (Defendants' proposed definition).  The Court adopts neither definition.  MyMail's definition rolls the process of a user connecting to the network into the subsequent processes of a user's presence on the network being authenticated and the user being assigned a unique IP address.  The specification teaches that the process of connecting is distinct from those two very closely related subsequent steps.  *See* Col. 7:7-19; 11:31-33.  Defendants' definition improperly substitutes "link" for "connection."  Although a link may be the ordinary meaning of a connection, Claim 3 of the patent uses those two words differently.

The claims of the '290 patent in which these terms appear all deal with establishing network connections between the user's computer and the network.  Upon completing a network connection, the user's computer is on the network.  Once on the network, the user's computer has the ability to communicate with other computers on the network.  Thus, the Court defines the above family of terms as "establishing the ability to communicate with the network" since the act of connecting, in the context of the '290 patent, establishes the ability to communicate with the network.

*[Said]  Given NSP*

The word "given" is used throughout the '290 patent.  *See, e.g.,* Col. 3:6 ("a given terminal"); 3:48 ("a given user"); 14-17-18 ("a given location"); 14:30 ("a given ISP's modems"); 24:26-27 ("a given system, a given group of users, a given group of systems"); 25:10 ("a given recipient"); 29:32 ("a given client's email messages").  Each time "given" was used, it was in a normal, non-technical manner.  Similarly, in the phrase "[said] given NSP," the word "given" is used in a normal, non-technical manner.  To the extent the jury even needs the Court to clarify this easy to understand, non-technical phrase, the Court defines "[said] given NSP" as "a particular NSP."

*Hidden time-shared set of log-in information*

In this phrase, the words "hidden" and "time-shared" are two separate modifiers to the claim term "set of log-in information," which the Court defines in a later section.

MyMail asserts that "hidden" means "not easily accessible to the user."  Defendants assert that it means "unknown and inaccessible to the user."  Because "hidden" is a normal, non-technical word, the Court notes that the definitions proposed by MyMail and Defendants are correct.  Since the patent defines "hidden" as "not easily accessible to the user," the Court will adopt MyMail's definition. Col 18:25.

MyMail proposes defining "time-shared" as "usable by multiple NSPs or multiple users during a period of time," while Defendants propose defining it as "allocated to multiple users each for a separate period of time."   The Court adopts Defendants' construction.  "Time-shared" is a word familiar to those in the computing field.  The Microsoft Press Computer Dictionary defines time-sharing as running separate programs concurrently by interleaving portions of processing time

allocated to each program user.  *See* MICROSOFT PRESS COMPUTER DICTIONARY (3d ed. 1997). Put simply, computer time-sharing is analogous to condominium time-sharing, where many lessees each take turns occupying a vacation property for a fixed period of time.   Defendants' definition better reflects the meaning of time-shared, as understood by one skilled in the art.

*Initialization NSP; initialization log-in data; initializing set of identification information*

Defendants seek definitions similar to the one agreed upon for "initial use set of log-in information," where "initial" is roughly equivalent to "first time."  MyMail asserts the "first time" limitation is unique to Claim 1 [the claim where "initial use set of log-in information" appears] since it does not appear in Claims 12 and 13 [the claims where the above disputed phrases appear]. In the context of Claims 12 and 13, MyMail asserts that the words "initial" and "initializing" refer to the beginning of a particular session. The Court finds MyMail's arguments to be circular and unpersuasive.   The limitation in Claim 1 to which MyMail refers – "initial use set of log-in information for initially communicating with an access SP" – merely restates that the "initial use set" is "initially" used.  It does not shed light on the meaning of "initial" in the patent.

The word "initial" and variations of that word are used consistently throughout the specification to refer to the first time the user contacts the ASP.  *See, e.g.,* Col. 6:50-51, 57; 13:24-25; 15:55; 16:42-45, 60.  The Court therefore defines "initialization NSP" as "an NSP used the first time the user contacts the ASP," "initialization log-in data" as "log-in data used the first time the user contacts the ASP," and "initializing set of identification information" as "a set of information used the first time the user contacts the ASP."

To the extent the definition of "initial" in different claims should constitute a question of

11

claim differentiation – as MyMail seems to hint – the Court notes that the "first-time" limitation is not absolute.  Rather it refers to the first-time a user configures and establishes communications with an ASP or network, and distinguishes subsequent sessions where the user is simply reestablishing, without any reconfiguration, communications. *Cf.* Col. 6:50-51; 13:24-25.  Put simply, there could be more than one first-time and the different claim language accounts for that, allowing a global definition of "initial" to suffice.

*Modified set of log-in data*

MyMail proposes this phrase be given its ordinary meaning and be defined as "a set of log-in data that has been changed."  Defendants propose "a set of log-in data in which the user ID and password of the previously provided set of log-in data have been changed."  Defendants' construction implies that, to the extent the log-in data is composed of a user ID and password, both components must be modified.  While that assumption is generally correct, the Court finds no reason to read that limitation into the claim definition.  The specification indicates that other parameters could change.  *See* Col. 7:57-66; 8:22-27; 17:3-7.  The Court therefore concludes this phrase should be given its ordinary meaning and adopts MyMail's construction.

*Network*

The term "network" is well-known to those in the art.  According to the Microsoft Computer Press Dictionary, the ordinary meaning of "network" is "a group of computers and associated devices that are connected through communication facilities."  *See* MICROSOFT PRESS COMPUTER DICTIONARY (3d ed. 1997).  Thus, the definition of "network" has two elements: connecting and

communicating.

The parties agree that a network must include a system or group of interconnected computers. Defendants assert that, in the context of the '290 patent, no other limitations are necessary. The Court disagrees with Defendants, since this definition ignores the communication element. MyMail asserts that the group of interconnected computers must also be uniquely identified, since according to the specification, after logging on to the network, a user receives an IP address to uniquely identify itself on the network. *See* Col. 7:10-19. The Court also disagrees with MyMail. The specification does discuss unique identification, but the unique identification simply serves as a means of establishing the interconnected computers' ability to communicate. Unique identification is not necessarily required. What is required is that ability to communicate. The Court therefore defines "network" as a "system of interconnected computers that have the ability to communicate."

*Network device; network accessing device*

MyMail asserts that the definition of both terms is a "general purpose computer and associated software capable of connecting to a network." Defendants argue that a "network device" is "a device communicating with a network" and that a "network accessing device" is "a device using the resources of a network." The Court adopts elements of each proposed definition, and construes both terms to mean "a device capable of communicating with the network."

According to both the Microsoft Press Computer Dictionary and Webster's Dictionary of Computer Terms, "device" is a broad and generic term that can refer to virtually any piece of computing equipment, so the Court concludes no definition of "device" is necessary. *See* MICROSOFT PRESS COMPUTER DICTIONARY 141 (3d ed. 1997); WEBSTER'S NEW WORLD DICT. OF

13

Comp. Terms 144 (6th ed. 1997).  What makes a generic device a "network device" or "network accessing device" is the capability of communicating with the network.  The specification explains such devices supply "the basic capabilities needed to successfully connect the user" to the network. Col. 9:17-18.  The device need not be continuously connected, as Defendants assert, but must only provide the capabilities needed to establish a connection.  Indeed, Claim 1 states that the user connects, disconnects, and is reconnected.  However, the specification makes it apparent that only devices with the ability to communicate with the network, after a connection is established, are network devices or network accessing devices, so the terms must be defined in the context of communications, not connections.

_Selected NSP_

MyMail asserts that this term does not need a definition, but if "selected NSP" is defined, it should be construed as "an NSP for which the ASP provides a customized set of identification information."  Defendants assert that MyMail's proposed definition merely restates claim language and that the more proper – and more descriptive – definition is "the NSP specified by the ASP."  The Court concludes this term needs to be defined, but Defendants' definition unnecessarily limits "selected NSP" to an NSP specified by the ASP.  The specification teaches that either the user or the ASP can control which set of identification information is generated by the ASP.  _See_ Col. 22:34-41. Thus, the Court adopts MyMail's proposed definition.

_Set of identification information; set of log-in information; set of log-in data_

The parties agree all three terms should be accorded similar meanings, but propose different

14

constructions.   MyMail proposes that "set of identification information" be construed as "information reflecting a user's identity, such as a PAP ID, used to authenticate the user's right to communicate with an ASP via an NSP" and the other two terms be construed as "information or data used to authenticate a user's right to connect to the network via an NSP."   Defendants propose all three terms be construed as "user ID and password."   The Court adopts elements of both proposed definitions for "set of identification information" and substantially adopts MyMail's definition for the other two terms.

"Set of identification information" appears in Claim 13.   Read in the context of that claim, it is synonymous with "access information," which "comprises the previously mentioned access telephone number, the PAP ID, the PAP password, and additional ISP specific information required by the user [ ] to gain access to the Internet [ ] via the predetermined ISP."   6:42-46.   MyMail's definition, in large part, flows from this portion of the specification.   Defendants assert their definition is correct since, according to the specification, the "set of identification information" must include at least a user ID and password.   Defendants also assert that the structure of the claim language already reflects that additional information may be included, so the definition of "set of identification information" should only reflect the minimum requirements of a user ID and password. Although the Court agrees in principle with Defendants' argument, adopting Defendants' proposed construction would in practice do little to "elaborat[e] the normally terse claim language in order to understand and explain . . . the scope of the claims." *Embrex,* 216 F.3d at 1347. The Court instead adopts a definition with a structure similar to MyMail's proposal and defines this term as "information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network."   This definition reflects the open-ended nature

15

of this term yet also sets the elements necessary to authenticate a user's rights as threshold requirements.

"Set of log-in information" and "set of log-in data" are cleanly defined by the claims in which they appear.  To the extent definition is necessary, the Court defines both terms as "information or data used to authenticate the user's right to connect to the network."  This definition flows directly from the claim language.  As such, MyMail's "via an NSP" limitation is redundant.

## CONSTRUCTION OF TERMS IN CLAIMS 9 AND 10

Claims 9 and 10 are not asserted against any of the Defendants.  Nevertheless, Defendants ask the Court to construe the terms "service entity," "service provider," and "service provider specific data."  Because these terms have not been fully briefed to the Court, the Court declines to construe these terms.

The Court recognizes that a declaration of invalidity regarding the '290 patent is being sought.  If invalidity is asserted against claims 9 and 10, the Court will then construe claims 9 and 10, after those terms have been properly briefed.

## ORDER OF STEPS

Whether certain steps must be performed in a certain order is an issue that the Court must decide as part of claim construction. *See Altris v. Symantec,* 318 F.3d 1363, 1369 (Fed. Cir. 2003). To determine whether steps of a claim must be performed in order, the Court "look[s] to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Id.*  Defendants assert the claim language of Claims 1, 3, 6, 11, 12, and 13 require the

16

recited steps to be performed in a particular order.[1]  Plaintiffs did not address this issue in their

briefs.  As such, the Court adopts Defendants' proposed sequence of the recited steps for Claims 3,

6, 11, 12, and 13.  This sequence is listed in the chart below.  However, based upon arguments at the

*Markman* hearing, the Court concludes that the steps of Claim 1 can be interchanged, so it concludes

the steps do not need to be performed in a specific order.


## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner

set forth above.  For ease of reference, the Court's interpretations of the claims are set forth in

Appendix B.

**So ORDERED and SIGNED this 3rd day of June, 2005.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

---

[1]Defendants also assert that the recited steps in Claims 9 and 10 need to be performed in a certain order.  Because the Court has decided not to construe those terms, Defendants' assertions with regard to the order of the steps recited in those terms will not be addressed.

# APPENDIX A

What is claimed is:

1. A method of **connecting** a use to a **given NSP (Network Service Provider)** comprising the steps of:

    providing a **network device** user with an **initial use set of log-in information** for initially **communicating with an access SP** via an **available NSP**;

    storing in a **database** of the **network device** a **hidden time shared set of log-in information** supplied by sad [SIC] **access service** for **accessing said given NSP**; and

    **causing** the **network device** to **reestablish communication with the network** via **said given NSP** using the **hidden set of log-in information**.

2. The method of claim 1 further comprising the step of supplying said **set of log-in information** for **said given NSP** to other users **contacting said access service**.

3. A method of **connecting** a user to a **network** comprising the steps of:

    receiving a first **access** telephone number of an access service provider;

    establishing a first telecommunications link to the **access service provider** via the first **access** telephone number;

    receiving from the **access service provider** via the first telecommunications link one or more second **access** telephone numbers for future communications; and

    **connecting** to the **network** via a second telecommunications link via one of the one or more second **access** telephone numbers.

4. The method of claim 3, wherein the first telecommunications link and the second telecommunications link comprises at least one of a packet-switched communications link and a circuit-switched communications link.

5. The method of claim 3, wherein the **network** is the Internet.

6. A method of connecting a user to a network comprising the steps of:

    providing the user a first **access** telephone number to access an **access service provider** via an **available NSP**;

**providing to the user a connection to the network** via the first access telephone number and the **available NSP**;

providing to the user from the **access service provider** information indicating a second access telephone number for a **given NSP**; and

**providing to the user a connection to the network** via the second access telephone number and the **given NSP**.

7. The method of claim 6, wherein the first access telephone number is an **"800" telephone number**.

8. The method of claim 6, wherein the second **access** telephone number is the same telephone number as the first **access** telephone number.

9. A method of accessing a network comprising the steps of:

receiving data from a service entity on the network and storing said data in at least one database of a terminal;

retrieving service provider specific data from said at least one database for use in accessing at least a portion of the network;

contacting said service provider through at least a portion of the network in accordance with the retrieved data to obtain a temporarily assigned network address;

accessing at least a portion of the network through said service provider; and

contacting said service entity and updating said at least one database with data received from said service entity.

10. The method of claim 9 comprising the additional step of:

automatically inserting said service provider specific data in a calling program, after selection of said provider by a user of said terminal, preparatory to contacting said service provider.

11. A method of obtaining access to a network comprising the steps of:

**accessing** the **network** via an available **network service provider (NSP)** using a previously provided **set of log-in data**;

**communicating** with an **access service**;

storing a **modified set of log-in data** received from said **access service**;

**disconnecting** from the **network**; and

using said **modified set of log-in data** when next **accessing** the **network** via a **given NSP**.

12. A method of preventing a **network** user from unauthorized distribution of **network access** log-in data comprising the steps of:

supplying a user with **initialization log-in** data whereby a temporary **communication with the network** via an **available network service provider (NSP)** may be established between a **network accessing device** and an **access service**;

storing a **hidden set of log-in data** in said **network accessing device** obtained from said **access service** during the temporary **communication with the network**; and

**causing** said **network accessing device** to **disconnect** from the temporary **communication with the network** and to re-establish **communication with the network** via a **given NSP** using said **hidden set of log-in data** stored in said **network accessing device**.

13. A method of **connecting** a user to an **NSP (Network Service Provider)** comprising the steps of:

providing to a user an **initializing set of identification information**;

establishing **communication with an access SP (Service Provider)** on the **network** through an **initialization NSP** using the **initializing set of identification information**;

receiving and storing a customized **set of identification information** from said **access SP** for a **selected NSP**;

breaking **communication** with said **initialization NSP**; and

re-establishing **communication with the network** through said **selected NSP** using the customized **set of identification information**.

# APPENDIX B

| U.S. Patent No. 6,571,290 | |
|---|---|
| DISPUTED CLAIM TERMS | COURT'S CONSTRUCTION |
| **NSP (network service provider)**<br><br>Claims 1-2, 6-8, and 11-13 | a party that provides a connection to the network and authenticates users for access to the network |
| **access SP; access service provider; access service; ASP**<br><br>Claims 1-8, 11-13 | a party that provides authenticated access information to a user through the network to enable the user to access one or more NSPs |
| | |
| **"800" telephone number**<br><br>Claim 7 | toll-free telephone number |
| **all forms of "access"**<br><br>Claims 1-13 | to gain entry to a computer system and make use of its resources |
| **available NSP**<br><br>Claims 1 and 6 | [AGREED]<br>an NSP accessible to the user |
| **cause; causing; all forms of "cause"**<br><br>Claims 1 and 12 | bring about |
| **communication with the network; communicating/communication with an ASP; all forms of "communicate"**<br><br>Claims 1, 11, 12, and 13 | communication with the network: exchange of data over a connection to the network<br><br>communication with an ASP: exchange of data with an ASP over a connection to the network |
| **connecting to the network; providing to the user a connection to the network; all forms of connect**<br><br>Claims 1, 3, 6, and 13 | establishing the ability to communicate with the network |

| | |
|---|---|
| **customized set of identification information**<br><br>Claim 13 | **[AGREED]**<br>a set of identification information tailored to an NSP |
| **database**<br><br>Claim 1 | **[AGREED]**<br>organized collection of data |
| **disconnect**<br><br>Claims 11 and 12 | **[AGREED]**<br>to sever or interrupt a connection |
| **[said] given NSP**<br><br>Claims 1, 2, 6, 11, and 12 | a particular NSP |
| **hidden time shared set of log-in information**<br><br>Claims 1 and 12 | hidden: not easily accessible to the user<br><br>time shared: allocated to multiple users each for a separate period of time |
| **initialization NSP**<br><br>Claim 13 | an NSP used the first time the user contacts the ASP |
| **initial use set of log-in information**<br><br>Claim 1 | **[AGREED]**<br>log-in information used the first time the user contacts the ASP |
| **initialization log-in data**<br><br>Claim 12 and 13 | log-in data used the first time the user contacts the ASP |
| **initializing set of identification information**<br><br>Claim 13 | a set of information used the first time the user contacts the ASP |
| **modified set of log-in data**<br><br>Claim 11 | a set of log-in data that has been changed |
| **network**<br><br>Claims 1, 3, 5, 11, 12, and 13 | a system of interconnected computers that have the ability to communicate |

| network device; network accessing device<br><br>Claims 1 and 12 | a device capable of communicating with the network |
|---|---|
| reestablish communication with the network<br><br>Claim 1 | **[AGREED]**<br>establish communication with the network again |
| selected NSP<br><br>Claim 13 | an NSP for which the ASP provides a customized set of identification information |
| set of identification information<br><br>Claim 13 | information reflecting a user's identity, such as a PAP ID or PAP password, used to authenticate the user's right to communicate with the network |
| set of log-in information; set of log-in data<br><br>Claims 1 and 2 | information or data used to authenticate the user's right to connect to the network |

| SEQUENCE OF THE RECITED STEPS | |
|---|---|
| Claim 1 | none |
| Claim 3 | step a precedes step b<br>step b precedes step c<br>step c precedes step d |
| Claim 6 | step a precedes step b<br>step b precedes step c<br>step c precedes step d |
| Claim 11 | step a precedes step b<br>step b precedes step c<br>step c precedes step d<br>step d precedes step e |
| Claim 12 | step a precedes step b<br>step b precedes step c |

23

| Claim 13 | step a precedes step b |
| | step b precedes step c |
| | step c precedes step d |
| | step d precedes step e |